Anne **DAILEY**, Plaintiff–Appellee,

v.

**SOCIETE GENERALE**, Defendant–Appellant.

**No. 246, Docket 96–7249.**

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1996.

Decided March 5, 1997.

---

Laura S. Schnell, New York City (Vladeck, Waldman, Elias & Engelhard, P.C., Margaret L. Watson, on the brief, New York City), for Plaintiff–Appellee.

Michael A. Kalish, New York City (Winthrop, Stimson, Putnam & Roberts, New York City), for Defendant–Appellant.

Before FEINBERG, WALKER, and CABRANES, Circuit Judges.

WALKER, Circuit Judge:

Defendant Societe Generale (the "Bank") appeals from two opinions and orders of the United States District Court for the Southern District of New York (John G. Koeltl, *District Judge*), resolving various post-trial motions following a jury verdict in favor of plaintiff Anne Dailey ("Dailey") on her Title VII retaliation claim, as well as from the corresponding judgments entered by the district court. The first opinion, dated June 20, 1995 and reported at 889 F.Supp. 108 (S.D.N.Y.1995) ("*Dailey I*"), declined to deduct unemployment insurance from the jury's back pay award, and the second, dated February 14, 1996 and reported at 915 F.Supp. 1315 (S.D.N.Y.1996) ("*Dailey II*"), denied defendant's motion for judgment as a matter of law on the ground that plaintiff had failed to mitigate her damages, denied defendant's motion for a new trial on damages, and granted plaintiff's request for attorney's fees incurred in connection with various post-trial motions. The Bank now appeals each of these rulings.

For the following reasons, we affirm substantially all of the district court's decisions, and we vacate and remand only for consideration of plaintiff's supplemental fee application.

## BACKGROUND

In March of 1994, Dailey filed a complaint in federal district court, alleging that the Bank violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("Human Rights Law"), and the Administrative Code of the City of New York § 8–107 *et seq.* ("Administrative Code") by discriminating against her on the basis of her sex and by retaliating against her for having complained of sex discrimination while at the Bank. During the course of a five day jury trial, the following evidence was presented.

In November of 1990, Dailey was hired by the Bank to serve in a managerial position as both a Vice President in the Financial Institutions Group and a Manager of the Correspondent Banking Group. Her starting base salary was $85,000. From her first day of work on November 26, 1990 through August 20, 1992, Dailey reported directly to Alan White ("White"), the First Vice President and Manager of the Financial Institutions Group. During Dailey's first year at the Bank, White rated her performance as "superior" in two performance evaluations. These favorable evaluations led to an eight percent increase in Dailey's salary in the fall of 1991 and an $18,900 bonus in early 1992.

In August of 1992, White was fired from the Bank for his perceived responsibility for a transaction known as "Amerifund" in which the Bank lost over nine million dollars. Dai-

ley, who had worked on the Amerifund matter with White, was placed on a six month period of probation.

Jay Sands ("Sands") replaced White as Dailey's supervisor. In sharp contrast to White's 1991 performance evaluations of Dailey, Sands rated Dailey's performance as falling below expectations in November of 1992. Surprised by the poor evaluation, in early December of 1992 Dailey met with Kevin Hughes ("Hughes"), the Manager of Human Resources, to whom she had previously expressed her concern that there was a gender-based disparity in compensation at the Bank that resulted in Dailey being paid less than similarly situated male employees. Dailey testified at trial that she explained to Hughes her view that Sands's evaluation was undeserved given her superior performance, and was a likely product of the fact that he was simply uncomfortable working with women. Hughes assured Dailey that he would investigate the matter. Several weeks later Dailey asked Hughes whether any progress had been made with respect to Sands's appraisal and again expressed her concerns that the matter was gender-related.

In late December 1992 or early January 1993, Hughes told Dailey that he had negotiated an arrangement with the Bank's senior management whereby Dailey would resign from the Bank, would be paid six months salary as severance pay, and would be entitled to use outplacement services to aid her in obtaining a new position. In exchange, Dailey would sign a release relinquishing any right to institute legal action against the Bank.

Dailey testified that after thinking over the Bank's proposal, she decided to reject it because of her concern that it would take her longer than six months to find another position and therefore the six months severance package would be inadequate. When Dailey conveyed this concern to Hughes, he was able to modify the terms of the severance arrangement to allow Dailey's salary to be extended, at the Bank's discretion, month-to-month for up to six more months following the initial six month period, based upon reports from Dailey that she was doing her best to secure alternate employment.

Dailey testified that, after Hughes communicated this modification to Dailey, he said that he would no longer negotiate with management on Dailey's behalf, and threatened that, if Dailey refused the second offer, he would cut off her access to outplacement services and would "cut her off at the knees." Dailey nonetheless told Hughes that she would not accept the modified offer. At that point, Dailey testified, Hughes became very angry and told her that the upcoming Friday would be her last day at the Bank. Hughes also directed Dailey to report to outplacement services on the following Monday. After using these services for approximately two weeks, the Bank told the outplacement firm that it would no longer pay for Dailey to use its services. Accordingly, the outplacement firm told Dailey not to return. On January 29, 1993, Dailey was removed from the Bank's payroll.

Hughes gave a different account. He testified that Dailey never complained to him about sex discrimination at the Bank. According to Hughes, it was Dailey who first expressed the desire to leave the Bank and Hughes encouraged her to stay. Hughes testified that his negotiations for a severance package were at Dailey's behest and that he never told her that he would "cut her off at the knees" or otherwise retaliate against her if she did not accept it.

The jury returned a special verdict in favor of Dailey on her retaliation claim under Title VII and the Human Rights Law, but in favor of the Bank on the underlying sex discrimination claim. The jury awarded Dailey $300,000 in back pay and $100,000 in compensatory damages for pain, suffering, humiliation and mental anguish. The compensatory damages were reduced to $17,500 pursuant to stipulation.

Post-trial motions followed. The Bank moved to have the $9,900 Dailey received in unemployment compensation following her departure from the Bank deducted from the back pay award; for judgment as a matter of law setting aside the back pay damage award pursuant to Fed.R.Civ.P. 50(b); and for a new trial pursuant to Fed.R.Civ.P. 59(a) on plaintiff's retaliation claim and, in the alter-

native, for a new trial solely on plaintiff's back pay award. Both the Bank and Dailey cross-moved for attorneys' fee and costs. The Bank's motions were denied. The district court awarded Dailey costs and ninety percent of her requested attorneys' fees. From these rulings, the Bank takes its appeal.

## DISCUSSION

On appeal, the Bank challenges: (1) the district court's denial of the Bank's motion for judgment as a matter of law on the ground that Dailey failed to mitigate her damages; (2) the district court's denial of the Bank's motion for a new trial on damages on the grounds that the jury's finding that Dailey mitigated her damages and its calculation of Dailey's expected salary were unsupported; (3) the district court's denial of the Bank's motion to deduct unemployment compensation from the back pay award; and (4) the district court's calculation of attorneys' fees to be awarded to Dailey pursuant to her supplemental fee application.

### I. *Mitigation*

The evidence presented at trial established that after Dailey left the Bank, she tried to find a comparable position in banks in New York. However, after a six month search without a single offer and with her funds depleted, Dailey moved to Loretto, Pennsylvania, where, in autumn of 1993, she enrolled full-time in a physicians' assistant program at St. Francis College. Dailey testified that she was able to fund her education first with student loans, and then by a federal grant which covered her full tuition in exchange for her agreement to work in a medically underserved area of the country upon graduation.

In its post-trial motion for judgment as a matter of law pursuant to Rule 50(b), the Bank argued that plaintiff's discontinuation of her job search after six months and her subsequent full-time enrollment in school constituted an objectively unreasonable effort to mitigate her damages. The Bank also asserted that the jury's back pay calculation was erroneous to the extent that it included back pay for the period during which Dailey attended school.

Concluding that the jury was justified in finding that plaintiff had made a sufficient effort to mitigate her damages, the district court observed that, with respect to the first six-months of her job search, there was evidence that plaintiff (1) used defendant's outplacement services until they were cut off by defendant; (2) contacted many people in the banking industry to obtain leads about job openings; (3) used the services of executive recruiters; and (4) interviewed for open positions. The district court also observed that plaintiff's testimony that she decided to attend school in Pennsylvania only after she ran out of money and was no longer able to support herself in New York was not contradicted. "Thus," the district court reasoned, "the plaintiff chose to pursue this career option because she could not get a job in New York despite her diligent efforts, and without a job she could not continue to live in New York." *Dailey II,* 915 F.Supp. at 1322. In short, the district court denied the Bank's motion for judgment as a matter of law upon finding that "plaintiff presented ample evidence at trial to demonstrate that her decision to enter school was in accord with her duty to mitigate." *Dailey II,* 915 F.Supp. at 1322.

A circuit court reviews the denial of a motion for judgment as a matter of law *de novo. U.S. E. Telecomms., Inc. v. U.S. W. Communications Servs., Inc.,* 38 F.3d 1289, 1301 (2d Cir.1994). Thus on review, we apply the same standard as the district court, namely, whether there was "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Buckley v. Metro–North Commuter R.R.,* 79 F.3d 1337, 1342 (2d Cir.) (quoting *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 14 (2d Cir.1993)), *cert. granted,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996).

We note at the outset that a prevailing plaintiff in a Title VII case must attempt to mitigate her damages by using "reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982); *see* 42 U.S.C. § 2000e–

5(g)(1). The Supreme Court has explained, however, that this obligation has limits: to satisfy the duty to mitigate, "the unemployed . . . need not go into another line of work, accept a demotion, or take a demeaning position." *Id.* Furthermore, "[the] claimant's burden is not onerous, and does not require him to be successful in mitigation." *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 624 (6th Cir.1983).

 While it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a plaintiff has failed to satisfy this duty. This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it. *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992); *see also Gaddy v. Abex Corp.,* 884 F.2d 312, 318 (7th Cir.1989). In the present case, the Bank asserts that Dailey breached her duty to mitigate by failing to satisfy the second element of this test in two ways. First, because Dailey herself predicted that it would take at least one year to find comparable work, the Bank maintains that a job search of only six months was necessarily unreasonable. The Bank claims that the financial problems Dailey may have encountered by living in New York while unemployed are, given Dailey's concession, "simply irrelevant." Brief of Defendant-Appellant Societe Generale at 12. Second, the Bank argues that Dailey breached her duty to mitigate by failing to continue her search for employment while enrolled as a fulltime student. By abandoning her job search entirely, the Bank argues, Dailey withdrew from the labor market, and was thus no longer "ready, willing and available" to accept other employment. We reject both arguments.

 We turn first to the Bank's contention that, in light of Dailey's admission that it would in all likelihood take her one year to obtain comparable employment, any job search for a period of less than one year was unreasonable. We think it clear that a Title VII plaintiff's predictions of how long it might take to secure a new job are not dispositive of the reasonableness of plaintiff's actual efforts to secure alternate employment. This is so because an assessment of the reasonableness of a plaintiff's effort to mitigate encompasses more than a simple review of the duration of his or her job search, or of the plaintiff's initial estimates as to how long a successful job search might take; instead, it entails a consideration of such factors as "the individual characteristics of the claimant and the job market," *Rasimas,* 714 F.2d at 624, as well as the quantity and quality of the particular measures undertaken by the plaintiff to obtain alternate work, *see, e.g., Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1497 (9th Cir.1995) (finding that filing applications, using university's career placement services, reviewing classified ads, and sending out resumes established diligent mitigation); *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1309 (7th Cir. 1984) (finding filing applications, reading classified ads, and discussing employment opportunities with friends to be "more than sufficient to constitute reasonable diligence").

 Under defendant's theory, if Dailey had predicted that it might take her two or three years to find another position, she would have been obligated to continue her search for that period of time, regardless of the personal and financial costs incurred during such a protracted period of unemployment. This result is plainly insupportable, particularly given the principle that a Title VII plaintiff "does not have to endure extreme hardship to meet her mitigation obligations[.] [R]ather, the obligation is one of 'reasonable diligence.'" *Dailey II,* 915 F.Supp. at 1322 (quoting *Ford Motor Co.,* 458 U.S. at 231, 102 S.Ct. at 3065).

 We also reject the Bank's argument that Dailey breached her duty to mitigate her damages by failing to continue seeking comparable banking positions in New York during the time that she was enrolled in school in Pennsylvania. Preliminarily, we note that there is no *per se* rule that finds inherently incompatible the duty of a Title VII plaintiff to use reasonable diligence in securing comparable employment and such a plaintiff's decision to attend school on a fulltime basis. Rather, the central question a court must consider when deciding whether a

student-claimant has mitigated her damages is "whether an individual's furtherance of his education is inconsistent with his responsibility 'to use reasonable diligence in finding other suitable employment.'" *EEOC v. Local 638,* 674 F.Supp. 91, 104 (S.D.N.Y.1987) (quoting *Ford Motor Co.,* 458 U.S. at 231, 102 S.Ct. at 3065). We believe that a fact-finder may, under certain circumstances, conclude that "one who chooses to attend school only when diligent efforts to find work prove fruitless," *id.,* satisfies his or her duty to mitigate. *See Smith v. American Serv. Co.,* 796 F.2d 1430, 1432 (11th Cir.1986) (decision to attend school full-time "entirely reasonable" where job search was futile and claimant had part-time job while in school).

The Bank cites to a handful of cases in which courts have determined that full-time students did not adequately mitigate their damages. In particular, defendant relies on the rule that, in general, a prevailing Title VII litigant must be "ready, willing, and available for employment," *Miller v. Marsh,* 766 F.2d 490, 492 (11th Cir.1985), and on cases, applying this rule, that have concluded that a full-time student is typically unavailable to hold a full-time position. *See, e.g., id.; Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 267–68 (10th Cir.1975).

The cases cited by defendant are distinguishable. They involve circumstances either where a plaintiff voluntarily absents herself from an active job market because she believes her ultimate earning potential will be enhanced with the benefit of further education or where the plaintiff completely fails to seek alternate employment prior to enrolling in school. *See Miller,* 766 F.2d at 492 (affirming denial of back pay award to plaintiff who began attending law school without first pursuing a comparable position

as stenographer); *Taylor,* 524 F.2d at 268 (affirming denial of back pay award for period employee abandoned job search in order to "reap greater future earnings" by attending school); *cf. Miller v. Swissre Holding, Inc.,* 771 F.Supp. 56, 60–61 (S.D.N.Y.1991) (disallowing back pay to plaintiff who made no effort to seek comparable employment, but instead attempted to start own business). In this case, in contrast, there was no evidence presented that Dailey's decision to obtain training as a physician's assistant was undertaken for the purpose of reaping greater future earnings than she would have earned as a manager in the banking industry. Indeed, Dailey testified that an entry level physician's assistant could expect to earn only $40,000 annually—a sum substantially less than the $85,000 Dailey earned when she began working for the Bank. Thus the jury could have easily concluded that Dailey's decision to quit New York and attend school in Pennsylvania was motivated not by a desire to obtain access to an industry with greater compensation, but rather by the fact that after a diligent, but unsuccessful, job search in New York, Dailey could no longer support herself there. *See Hanna,* 724 F.2d at 1308 (where claimant decided to attend school not to reap greater future earnings, but only to obtain needed income following fruitless job search, duty to mitigate satisfied).

In short, the jury reasonably could have found that the plaintiff's six month job search in New York was diligent, and that her decision to attend school was also reasonable in light of both the job market in New York and plaintiff's depleted financial resources.[1] Because there was evidence that would allow a reasonable juror to conclude that plaintiff satisfied her statutory obligation to mitigate her damages, the district court did not err in

---

1. As the Bank conceded at oral argument, the jury was accurately instructed with respect to plaintiff's obligation to mitigate. The instruction provided:

> The defendant contends that the plaintiff failed to mitigate her damages, if any. A plaintiff has a duty to mitigate damages by using reasonable care and diligence in seeking suitable alternative employment. A plaintiff need not go into another line of work, accept a demotion or take a demeaning position but must use reasonable care and diligence in

seeking a job substantially equivalent to the one that was lost.

> While a plaintiff who abandons her willingness to search for and return to work and chooses to attend school instead generally does not meet her duty to mitigate damages during the time she is in school, a plaintiff who chooses to attend school only when diligent efforts to find work proved fruitless or who continues to search for work even while enrolled in school does meet her duty to mitigate.

denying the Bank's motion for judgment as a matter of law.

## II. *Motion for a New Trial*

■ The Bank also appeals from the district court's denial of a new trial on damages, maintaining that the evidence adduced at trial does not support the jury's $300,000 back pay award. In particular, the Bank argues that (1) the evidence does not support the jury's conclusion that plaintiff adequately attempted to mitigate her damages; and (2) even if Dailey may be found to have mitigated her damages, the evidence does not support the $300,000 back pay award, which is based on the assumption, erroneous in the Bank's view, that Dailey would have received certain bonuses and salary increases had she remained at the Bank.

■ As a general rule, an appellate court will reverse a trial court's denial of a new trial motion if the denial constitutes an abuse of discretion. *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir.1988). This circuit, however, recognizes an exception to this rule: where a district court denies a motion for a new trial made on the ground that the verdict was against the weight of the evidence, such a ruling is not reviewable on appeal. *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1199 (2d Cir.1995). This rule applies with equal force to weight-of-the-evidence motions challenging the size of a verdict and to such motions challenging the jury's finding of liability. *See Haywood v. Koehler*, 78 F.3d 101, 104 (2d Cir.1996); *see also* 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2807 (1995) (describing grant of new trial based on verdict-size being against the weight of the evidence as "merely a special application of the general power of the trial court to set aside a verdict that is against the weight of the evidence"). Plaintiff argues that the Bank's new trial motion was based on the ground that the jury's damage calculation was against the weight of the evidence, and that, therefore, the district court's denial of that motion is not reviewable by this court. We agree.

Initially, we note that one of the reasons defendant claims a new trial should have been ordered is that the evidence does not support the jury's conclusion that plaintiff mitigated her damages. To the extent that the Bank presses this theory as a basis for judgment as a matter of law, we have already rejected it; to the extent that defendant urges its mitigation argument as a component of its more general position that the jury's award is against the weight of the evidence, the district court's denial of that motion prevents us from reviewing it. *See Stonewall Ins. Co.*, 73 F.3d at 1199.

The district court also rejected the defendant's argument, as part of the new trial motion, that the jury miscalculated the salary increases and bonuses plaintiff would have received had she remained at the Bank. This argument, unlike the Bank's mitigation argument, was not included in its motion for judgment as a matter of law, and thus will remain unreviewed by this court if we find that it is essentially a claim that the jury award was against the weight of the evidence.

Although defendant in its reply brief on appeal attempts to recharacterize the nature of the new trial motion made before the district court as one of insufficiency of the evidence (as opposed to being against the weight of the evidence), the recharacterization rings hollow. The Bank has consistently argued that the jury's calculation of plaintiff's future bonuses and salary increases was against the weight of the evidence, not that the evidence supporting the calculation was insufficient as a matter of law. For example, in the Bank's reply memorandum of law in support of its motion for a new trial, it contended not that the evidence was legally insufficient to support the jury's calculation, but rather that "given plaintiff's probationary status and poor performance under her new boss, bonuses at her previous 22% level when she was deemed a 'superior' employee were not a realistic assumption. The jury's verdict was the product of speculation." We also find significant the fact that Judge Koeltl plainly viewed the Bank's argument as seeking a new trial on the basis that the jury's determination was against the weight of the evidence. This is apparent in his description of the standard of review applica-

ble to defendant's new trial motion: "A motion for a new trial ... may not be granted on the basis of the weight of the evidence unless a jury's verdict is 'seriously erroneous.'" *Dailey II*, 915 F.Supp. at 1323. Finally, the Bank argued in its principal brief to us on appeal explicitly that "[a] new trial is warranted where, in the court's judgment, *the weight of the evidence is against the verdict.*" Brief of Defendant–Appellant Societe Generale at 16 (emphasis added).

Our conclusion that the Bank's new trial motion rested solely on a weight of the evidence theory is buttressed by the substance of the Bank's new trial arguments, which, dependent as they are on weighing the credibility of Hughes's testimony on the Bank's compensation policies, are suitable only in the context of such a motion. *See Song v. Ives Lab.*, 957 F.2d 1041, 1047 (2d Cir.1992) ("In contrast to the standard applied in considering a motion for judgment n.o.v., a trial judge hearing a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.") (citation and internal quotations omitted). And finally, we note our suspicion that had the Bank all along maintained that the jury's findings with respect to plaintiff's future salary expectations were wrong as a matter of law, it would not have neglected to include this argument in the portion of its papers devoted to setting forth its Rule 50(b) argument.

For all these reasons, we conclude that the Bank's new trial motion was based on the argument that the back pay calculation was against the weight of the evidence. We thus decline to review the district judge's denial of the Bank's motion for a new trial.[2] *See Stonewall Ins. Co.*, 73 F.3d at 1199.

### III. *Deduction of Unemployment Compensation*

 The Bank argues that the district court erred when it refused to deduct from the jury's back pay award the $9,900 Dailey received in unemployment compensation benefits. The Bank urges this court to adopt a "clear rule of law" that would require that such payments be deducted. The question of whether unemployment compensation should automatically be deducted from a Title VII plaintiff's back pay award is an open one in this circuit. *See Promisel v. First Am. Artificial Flowers*, 943 F.2d 251, 258 (2d Cir. 1991).

In *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951) the Supreme Court affirmed the NLRB's decision not to deduct unemployment compensation payments from a back pay award obtained from an employer found to have discriminated on the basis of union membership. In concluding that the NLRB's refusal to deduct the unemployment benefits effectuated the remedial policies of the National Labor Relations Act, the Supreme Court rejected the argument that such refusal permitted a double recovery for the plaintiffs, finding instead that such benefits were collateral to the recovery obtained from the employer, and hence, need not be deducted. As the Court explained:

> To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole.... Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.

*Id.* at 364, 71 S.Ct. at 339. Furthermore, in rejecting the argument that because the employer itself funded the state's unemployment compensation fund, unemployment compensation amounted to a direct (rather than collateral) benefit, the Court noted that "payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social

---

2. Even if we were to view the Bank's new trial motion as one challenging the sufficiency—rather than the weight—of the evidence supporting the jury's back pay calculation, we would affirm the award. Construing the evidence in the light most favorable to Dailey, *see Metromedia Co. v.* *Fugazy*, 983 F.2d 350, 361 (2d Cir.1992), we are not "satisfied ... that the evidence is so one-sided and contrary to the jury's verdict that there is only one reasonable conclusion as to the proper judgment." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir.1992).

betterment for the benefit of the entire state." *Id.; see also EEOC v. Ford Motor Co.,* 645 F.2d 183, 196 (4th Cir.1981) ("[A]wards of back pay under Title VII should not be affected by a system of compensation which is designed to serve a wholly independent social policy."), *rev'd on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

Because a court's remedial power under the NLRA and Title VII are analogous, *see Local 28 of the Sheet Metal Workers' Int'l Assoc. v. EEOC,* 478 U.S. 421, 447 n. 26, 106 S.Ct. 3019, 3035 n. 26, 92 L.Ed.2d 344 (1986), appellate courts have applied the Supreme Court's reasoning in *Gullett Gin* to the question of whether unemployment compensation should be deducted from Title VII awards. The results of this application, however, have been far from uniform.

A majority of courts to have considered the issue has relied on *Gullett Gin* for an endorsement by the Supreme Court of the non-deductibility of collateral benefits generally, and of unemployment compensation specifically. They have held that unemployment benefits should never be deducted from back pay awards. *See Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1114 (8th Cir. 1994) (ADEA); *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 82–84 (3d Cir.1983); *Brown v. A.J. Gerrard Mfg. Co.,* 715 F.2d 1549, 1550–51 (11th Cir.1983); *Rasimas,* 714 F.2d at 627 n. 13; *Kauffman v. Sidereal Corp.,* 695 F.2d 343, 346–47 (9th Cir.1982); *EEOC v. Ford Motor Co.,* 645 F.2d at 195. A minority of courts, however, has concluded that because *Gullett Gin* affirmed the NLRB's non-deduction as an exercise of the Board's discretion, this same discretion should apply to a district court's decision whether or not to deduct. *See, e.g., Daniel v. Loveridge,* 32 F.3d 1472, 1478 n. 4 (10th Cir.1994); *cf. Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1428–29 (7th Cir.1986).

The Second Circuit, on past occasions, has affirmed district court determinations to deduct unemployment compensation or other collateral benefits from Title VII awards. *See, e.g., Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 47 (2d Cir.1980). The most detailed explanation for approving this deduction is found in *EEOC v. Enterprise Ass'n Steamfitters Local No. 638,* 542 F.2d 579, 591 (2d Cir.1976), where we affirmed the district court's deduction of public assistance from a back pay award. Despite our observation that "[t]he weight of common law authority is that collateral sources are not deductible from a tort damage award," *id.,* we stated:

> [W]e are inclined to agree with ... the rulings in other circuits which have held it not an abuse of discretion to deduct sums received from collateral sources such as unemployment compensation.... We see no compelling reason for providing the injured party with double recovery for his lost employment; no compelling reason of deterrence or retribution against the responsible party in this case; and we are not in the business of redistributing wealth beyond the goal of making the victim of discrimination whole.

*Id.* at 592. Because *Enterprise Ass'n. Steamfitters Local No. 638* suggests that not only is the deduction of collateral sources within the discretion of the district court, but also that such deduction might be affirmatively required, the question of whether this circuit might mandate such deduction has since remained open. In *Promisel v. First Am. Artificial Flowers,* 943 F.2d at 258, for instance, we observed that "[w]hether unemployment compensation ... should automatically be deducted from an award of lost wages has not been answered by this circuit." In *Promisel,* however, we also stated that "[w]hile collateral source payments do represent an additional benefit to the plaintiff, we note a sister circuit's view that '[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer.'" *Id.* (quoting *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 795 (3d Cir.1985)).

We now state explicitly what was implied in *Promisel:* the decision whether or not to deduct unemployment benefits from a Title VII back pay award rests in the sound discretion of the district court. We do not believe that the rule, urged by the Bank, requiring the deduction of these collateral benefits is appropriate, particularly in view of

the compelling reasons, expressed by many of our sister circuits, that a district court might decline to deduct unemployment insurance from back pay. *See Hunter,* 797 F.2d at 1429 (noting that even where court has discretion to deduct, as between conferring windfall to victim of wrongdoing and wrongdoer, victim is the "logical choice").

Accordingly, we conclude, in the circumstances presented here, that the district court did not abuse its discretion in determining that Dailey's unemployment benefits should not be deducted from the jury's back pay award.

## IV. *The Supplemental Fee Award*

■ Following trial, plaintiff moved for attorneys' fees and costs, which the court was authorized to award in its discretion pursuant to 42 U.S.C. § 2000e–5(k). After calculating the proper lodestar, the district court reduced the amount by ten percent to reflect the fact that plaintiff did not prevail on her discrimination claim and was thus only partially successful at trial, and awarded plaintiff's attorneys' fees and costs in the amount of $192,903.45. *Dailey II,* 915 F.Supp. at 1332. The district court made no similar reduction to plaintiff's supplemental fee request, however, which represented fees and costs incurred in connection with plaintiff's opposition to various post-trial motions filed by defendant, as well as plaintiff's preparation of its motion for attorneys' fees. The district court instead granted the supplemental fee application in full, stating that "defendant has not challenged the plaintiff's request for $23,840.00 in [supplemental] fees." *Dailey II,* 915 F.Supp. at 1333.

Defendant now maintains that, in concluding that the Bank had not challenged the supplemental request, the district judge overlooked a letter from the Bank, filed with the court on November 22, 1995, which stated:

> For the reasons stated in defendant's earlier submissions in connection with plaintiff's fee application, defendant respectfully submits that [ ] the otherwise reasonable attorneys' fees sought by plaintiff should be reduced by 50% to reflect that she was

not the prevailing party on one of her two claims. . . .

Defendant argues that the district court neglected to review defendant's opposition to plaintiff's supplemental fee request, and, consequently, failed to reduce plaintiff's supplemental fee award by the same percentage as it reduced plaintiff's initial fee award.

It may be the case, as plaintiff contends, that the district court reviewed the November 22 letter, but, given its lack of specificity and absence of legal argument, nonetheless chose to deem the supplemental fee application unopposed. It may also be the case, as plaintiff argues, that the supplemental fee application pertains exclusively to legal work unconnected to the sex discrimination claim, and thus that the district court's rationale for the ten percent reduction of the original fee application would not apply to it. However, we believe that the district court should make this determination in the first instance, and, from the district court's opinion, it appears that the November 22 letter may have been overlooked. Accordingly, we remand this case to the district court for consideration of plaintiff's supplemental fee application. In so doing, we intimate no view with respect to whether the supplemental fee award should be reduced at all on remand.

## CONCLUSION

For the foregoing reasons, we affirm in part the orders and judgment of the district court, and we vacate and remand for consideration of plaintiff's supplemental fee application.