# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-30948

United States Court of Appeals
Fifth Circuit

**FILED**
July 11, 2016

Lyle W. Cayce
Clerk

APRIL OVERMAN,

      Plaintiff - Appellee

v.

CITY OF EAST BATON ROUGE; MELVIN "SKIP" HOLDEN, Mayor,

      Defendants - Appellants

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:13-CV-614

Before KING, JOLLY, and ELROD, Circuit Judges.

PER CURIAM:*

The plaintiff, April Overman, filed this action against the city of Baton Rouge, Louisiana, and Mayor Melvin "Skip" Holden, in his official capacity, under Title VII of the Civil Rights Act of 1964, and the Louisiana Employment Discrimination Law ("LEDL"). Overman alleges that the defendants chose not to hire her as the Baton Rouge police chief because she is a woman. After a bench trial, the district court rendered judgment for Overman. The defendants

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-30948

appeal the judgment, arguing (1) that the district court erred in finding that Overman successfully rebutted the defendants' proffered nondiscriminatory reasons for refusing to hire her; and (2) that the district court erred in finding that, following the defendants' decision not to hire her, Overman undertook reasonable efforts to mitigate her damages.

For the reasons that follow, we affirm the district court's finding of liability under Title VII. We, however, vacate the district court's award of damages and remand for reconsideration in the light of this opinion.

I.

Overman is a career law enforcement officer. From 1985 to 2010, she worked for the New Orleans Police Department ("NOPD"). Overman started as a patrol officer, and was promoted to narcotics detective in 1987. In 1991, Overman was promoted to her first supervisory position in the NOPD, when she became a sergeant. Overman was promoted to lieutenant in 2004, and captain in 2005, which is the rank she held until she retired from the NOPD in 2010. Before joining the NOPD, Overman earned a bachelor's degree in sociology and a juris doctorate from Tulane University; she also received a master's degree in sociology from Tulane University while working at the NOPD.

In early 2011, Overman applied, tested, and interviewed for the position of police chief for the city of Baton Rouge, Louisiana. Overman received the highest score among all thirty applicants on the civil service police chief examination. A committee, appointed by Mayor Holden and consisting of local business leaders, community figures, and government officials, interviewed Overman and ten other candidates—all of them male—in a group interview format. The committee ranked Overman as one of its top five candidates. These candidates were then referred to a smaller, five-member committee, which included Mayor Holden, for further consideration. Each candidate was

No. 15-30948

interviewed separately by the small committee. After the small committee interviews, Mayor Holden announced that he had selected another candidate, Dewayne White, as the new police chief.

White started his law enforcement career as a traffic and patrol officer at the Baton Rouge Police Department in 1983. In 1990, he left the Baton Rouge Police Department to become a state trooper with the Louisiana Department of Public Safety ("LDPS"). White was promoted to his first supervisory position in 1998, when he became a unit supervisor of the weights and standards department at the LDPS. White was thereafter promoted to the rank of captain, then major, within the LDPS's emergency services unit, where he supervised matters related to environmental safety and hazardous materials. White held this position until he became the new Baton Rouge Police Chief. White has a high school diploma, and recorded the eighteenth highest score on the civil service exam administered to all thirty applicants for the police chief position.

In September 2013, Overman filed suit under Title VII and the LEDL, alleging that the defendants had discriminated against her during the hiring process on the basis of her sex. The parties consented to try this case before a magistrate judge, and waived a jury trial. A bench trial was held on March 16–17, 2015. During the trial, Overman testified that, during both the small and the large committee interviews, she received numerous questions regarding how, as a woman, she would be able to adequately command a police department composed predominantly of male employees.[1] She also testified that, during the small committee interview, Mayor Holden asked her to "talk

---

[1] Overman's testimony on this point was reinforced by the testimony of at least one committee member, who recalled Overman being asked gender-based questions in the small committee meeting without objection from Mayor Holden.

about men," and quizzed her about problems that he heard Overman had with supervisors at the NOPD because she was a woman.

Mitigation of damages was also a major issue at trial. Accordingly, Overman testified regarding her efforts to find other employment after not being hired as the Baton Rouge police chief. Overman asserted that, after not being hired as the police chief, she applied for numerous other jobs, and eventually accepted a position as an instructor at a law enforcement training academy in Mississippi. Overman, however, resigned from this position in September 2012, and instead enrolled in classes full-time in an effort to finish her PhD in urban studies, which she was already working toward when she applied for the police chief position. Overman testified that she left the training academy job because of constant downsizing, and the inevitability that her position at the academy would soon be cut as well. Overman was not employed while working toward her PhD; she did, however, begin drawing on her state retirement pension. Overman also cared for and relocated her elderly mother during this time frame. After receiving her PhD in May 2014, Overman again started seeking employment; she eventually found a job as a professor in criminal studies.

The district court, after presiding over the bench trial and receiving post-trial briefing, rendered judgment in favor of Overman, and awarded her $272,148 in back pay and lost pension earnings. The district court found that the defendants' proffered legitimate reasons for not selecting Overman were pretextual because they were inconsistent or otherwise not credible.[2] The district court concluded that, following the defendants' decision not to hire her,

---

[2] The district court also found that Overman was "clearly more qualified" than White for the position of police chief, which, standing alone, can be sufficient to rebut a defendant's proffered nondiscriminatory reasons for refusing to hire the plaintiff.

No. 15-30948

Overman had demonstrated reasonable efforts to mitigate her damages by seeking equivalent work.  The defendants appealed.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011) (quotation marks and citation omitted); *see also* Fed. R. Civ. P. 52(a)(6) (stating that, following a bench trial, "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous").  Under the "clearly erroneous" standard, "we will uphold a finding so long as it is plausible in light of the record as a whole, or so long as this court has not been left with the definite and firm conviction that a mistake has been made."  *See Chemtech Royalty Assoc., L.P. v. United States*, 766 F.3d 453, 460 (5th Cir. 2014) (internal quotation marks and citations omitted); *see also In re Luhr Bros., Inc.*, 325 F.3d 681, 684 (5th Cir. 2003) ("'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985))).

## III.

The defendants contend that the district court clearly erred in (1) finding that Overman successfully rebutted the defendants' proffered nondiscriminatory reasons for refusing to hire Overman, and (2) finding that Overman undertook reasonable efforts to mitigate her damages.  We examine each argument in turn.

## A.

The district court found that the defendants violated Title VII and the LEDL by deciding not to hire Overman because she is a woman. The defendants concede that Overman has established a prima facie case of

employment discrimination under Title VII.[3]    The defendants, however, contend that they offered evidence of several nondiscriminatory reasons for refusing to hire Overman, and that the district court clearly erred in finding that Overman had successfully rebutted these proffered reasons by showing that they were pretextual.

Under Title VII, "[e]stablishing the prima facie case raises an inference of unlawful discrimination, and the burden of production then shifts to the defendant-employer to proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Blow v. City of San Antonio*, 236 F.3d 293, 296–97 (5th Cir. 2001) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).    If the defendant-employer establishes a legitimate, nondiscriminatory reason, the plaintiff must then produce evidence to establish either: "(1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).

After a careful review of the record, we hold that the district court did not clearly err in finding that the defendants' proffered reasons for refusing to hire Overman were pretextual.  In its opinion, the district court set out each of the defendants' proffered nondiscriminatory reasons, and explained why Overman had offered evidence showing that each reason was lacking in credibility, and thus pretextual.  *See* ROA.1279–90.  For example, the defendants asserted that they had selected White for the position of police chief

---

[3] The LEDL applies the same standards and burden shifting framework used for Title VII claims.  *See Baker v. FedEx Ground Package Sys. Inc.*, 278 F. App'x 322, 327 (5th Cir. 2008).  Thus, in keeping with the district court's opinion and the parties' briefing on appeal, we focus our analysis on Overman's Title VII claim.

simply because he had "local experience," which would allow for an easier transition period between chiefs. The district court, however, reasoned that Mayor Holden's own inconsistent statements suggested that this basis was pretextual; when seeking candidates for the police chief job, Holden announced that he was conducting a "nationwide" search for the best candidate, indicating that he was not concerned about fielding candidates with local experience. Moreover, at the time White was hired, he had not worked for the Baton Rouge Police Department in the past twenty years, and there was no evidence that White's later employment with the LDPS—in positions that the district court concluded were principally administrative in nature, and largely unrelated to urban policing—bestowed upon him any further "local experience." Finally, Mayor Holden could not even recall when and for what period of time White had worked for the Baton Rouge Police Department, further undercutting Holden's purported emphasis on past local experience when evaluating applicants' credentials.

The above example is illustrative of the rigorous examination that the district court afforded each of the defendants' other alleged nondiscriminatory reasons. Having reviewed the record, and having concluded that there is no clear error with respect to the district court's findings, we need not reexamine each of the defendants' proffered reasons here. We do, however, note that the district court found credible Overman's testimony that, during the committee interviews, she was subjected to a repetitive line of questioning based solely on doubts over whether, as a woman, she could be an effective police chief. The district court reasoned that Holden and other committee members' willingness to overtly and repeatedly express these gender-specific concerns when interviewing Overman "supports and solidifies the finding that the [defendants'] legitimate, nondiscriminatory reasons are not credible," and were instead pretextual.

No. 15-30948

We agree.  That committee members repeatedly asked Overman to address whether, as a woman, she could confidently manage and supervise male subordinates undermines the defendants' contentions that their employment decision was predominantly influenced by other, nondiscriminatory considerations.  At a minimum, the district court did not commit clear error in finding that this prominent line of questioning about gender-specific concerns was further evidence of pretext.[4]

The defendants urge that we should discount Overman's testimony about what transpired during the committee interviews because it is self-serving or otherwise dubious in the light of the record, and that, in any event, we should draw different inferences from the content of her testimony. As noted, however, the district court determined that Overman's testimony was credible; the inferences the district court drew from that testimony are, at least to some extent, based on that credibility finding.  We have previously emphasized that "the clearly erroneous standard of review following a bench trial requires even 'greater deference to the trial court's findings when they are based upon determinations of credibility.'" *Guzman v. Hacienda Records and Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (quoting *In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998)).

---

[4] Having concluded that the district court did not clearly err in finding that the defendants' purported "legitimate" reasons for refusing to hire Overman lacked a credible basis, and thus were pretextual, we need not consider the district court's alternative reasoning that Overman's clearly superior qualifications were, standing alone, indicative of intentional discrimination. *See Sanders v. Anadarko Petrol. Corp.*, 108 F. App'x 139, 143 (5th Cir. 2004) ("Pointing to clearly superior qualifications is one way to demonstrate intentional discrimination, but it is not the only way.  A plaintiff may also establish pretext by presenting evidence that the employer's proffered explanation is false or unworthy of credence, because it is not the real reason for the adverse employment action." (internal quotation marks and citations omitted)). To the extent that the district court merely considered Overman's exceptional resume as being one factor of many rendering not credible the defendants' proffered reasons for refusing to hire Overman, the district court did not commit reversible error.

8

No. 15-30948

We cannot say that the district court committed clear error in finding that the committee's gender-specific line of questioning took place, and was, in itself, indicative of discriminatory animus. Accordingly, we affirm the district court's finding of liability under Title VII and the LEDL. We now consider whether the district court clearly erred in finding that Overman undertook reasonable efforts to mitigate her damages following the defendants' decision not to hire her.

B.

The defendants next argue that, assuming liability under Title VII, the district court erred in not reducing its award of damages because Overman failed to engage in reasonable efforts to mitigate her losses stemming from the adverse employment decision. "A Title VII plaintiff has a duty to mitigate her damages by using reasonable diligence to obtain substantially equivalent employment." *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1045 (5th Cir. 1998) (citing *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)). "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Sellers*, 902 F.2d at 1193 (internal quotation marks omitted). The reasonableness of a Title VII claimant's diligence must be evaluated in the light of the "individual characteristics of the claimant and the job market." *Id.* (internal quotation marks omitted). The employer bears the burden of proving that a plaintiff failed to undertake reasonable efforts to mitigate her losses, and the district court's finding is, once again, subject to the clearly erroneous standard of review. *See id.* at 1193–94.

It is undisputed that Overman undertook reasonable efforts to mitigate her damages from May 2011 until September 2012. In late September,

however, Overman resigned from her position as an instructor at the Mississippi training academy to enroll in school on a full-time basis. The defendants contend that, at this point, Overman failed further to undertake reasonable efforts to mitigate her damages because she removed herself from the labor market. The district court, however, held that, considering Overman's individual circumstances, her decision to leave employment to enroll in school as a full-time student was consistent with the duty to take reasonable efforts to mitigate her damages resulting from lack of employment.

Contrary to the defendants' suggestions, a Title VII plaintiff's decision to attend school on a full-time basis does not always bar back pay during the period of enrollment. *See Dailey v. Societe Generale*, 108 F.3d 451, 456–57 (2d Cir. 1997) ("[T]here is no *per se* rule that finds inherently incompatible the duty of a Title VII plaintiff to use reasonable diligence in securing comparable employment and such a plaintiff's decision to attend school on a full-time basis. Rather, the central question a court must consider when deciding whether a student-claimant has mitigated her damages is whether an individual's furtherance of his education is inconsistent with his responsibility 'to use reasonable diligence in finding other suitable employment.'" (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982))); *see also Green v. Admin. of Tulane Educ. Fund*, 284 F.3d 642, 659 (5th Cir. 2002), *overruled on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).

There is a distinction, however, between attending school only after a diligent, but ultimately unsuccessful, job hunt, and a plaintiff who takes herself out of the job market to attend school in the hope of gaining access to higher paying jobs, foregoing comparable employment in the meantime. *Compare Dailey*, 108 F.3d at 456–57 (affirming an award of back pay when the plaintiff quit the job market to attend school only after an extensive job hunt failed to offer any comparable employment), *with Miller v. Marsh*, 766 F.2d

10

490, 492–93 (11th Cir. 1985) (affirming denial of back pay award to plaintiff who withdrew from temporary employment to begin attending law school without first pursuing a comparable position as a legal stenographer).

In fashioning Title VII remedies, we are mindful that back pay under Title VII is an equitable, or "make whole," remedy. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). As such, its purpose is to place the plaintiff in the position that she would have been in but for the defendant's illegal conduct. *Id.* at 418–19. When a plaintiff recovers back pay for the period of time when she has taken herself out of the relevant job market, the remedial purpose of back pay under Title VII, that is to "make whole" from the loss of the job, can be abnegated. *See, e.g., Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 267–68 (10th Cir. 1975) ("If a discharged employee accepted employment elsewhere, there is little doubt that this would cut off any back pay award. If not, the employee would be receiving a double benefit for the same period of time. Likewise, when an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school also would be like receiving a double benefit.").

We cannot discern from the record whether the district court appropriately considered whether Overman's decision to obtain her doctorate degree and change fields of employment from police work to full-time academia is consistent with the equitable principles of back pay under Title VII. It appears that the district court avoided this discussion despite Overman's admission that, following her decision to leave her job at the training academy, she did not undertake further efforts to seek employment until she completed her doctorate and took a position on the faculty of Southern New Hampshire

University.[5] *See* Dist. Ct. Op. at 36 ("After obtaining her doctorate the plaintiff could apply for higher-salaried positions at colleges, universities, and other institutions. The evidence shows that this is in fact what the plaintiff did. Plaintiff received her doctorate in May 2014 and then began looking for employment in higher education.").

Moreover, the district court relies on Overman's personal prerogatives—such as her decision to renovate her home and her need to relocate her elderly mother to another state—when deciding that Overman's decision to leave employment at the training academy was "reasonable" in the light of her duty to mitigate damages. *See* Dist. Ct. Op. at 35 (reasoning that the plaintiff made a reasonable effort to mitigate her damages, in part because she "left the training academy and devoted all her time to . . . renovating her home to sell and relocating her mother"). If these circumstances reasonably forced Overman to leave her job at the training academy, however, it follows naturally that they would have also prevented her from satisfying her duty to mitigate her damages by accepting other comparable work if available, or from remaining as the Baton Rouge police chief in the event that the defendants had instead hired her for the position. *See Winbush v. State of Iowa by Glenwood State Hosp.*, 66 F.3d 1471, 1486–87 (8th Cir. 1995) (finding that the district court clearly erred in awarding the plaintiff back pay under Title VII following her decision to leave the work force voluntarily to care for her elderly mother).

If Overman's decision to attend school resulted from a diligent, but ultimately fruitless, job hunt, then her duty to mitigate damages under Title VII may have been fulfilled. *See Dailey*, 108 F.3d at 457. Conversely, if Overman chose to pursue her PhD instead of pursuing comparable available

---

[5] Furthermore, at the time Overman left work at the Mississippi training academy in September 2012, a full year had passed since she last tested the job market for comparable employment.

employment, then she did not fulfill her duty to mitigate. *See Taylor*, 524 F.2d at 267–68. The district court, however, did not conduct this analysis, and instead generalized that Overman's efforts to mitigate were "reasonable" in the light of her personal responsibilities and other individual circumstances. Accordingly, we vacate the district court's award of damages, and remand the case for further consideration of whether Overman's decision to attend school on a full-time basis is consistent with her duty to mitigate damages under Title VII. In conducting this inquiry, the district court may hear additional testimony and consider additional evidence to the extent it deems appropriate.

## C.

Finally, we note that the record does not provide a clear understanding of how the district court calculated its damages award for "loss of pension increase." According to Overman's own testimony, her pension should have been calculated by taking 3.33% of the average of her highest three years of salary, and then multiplying that by years of service. The district court, however, relying on Overman's off-hand estimation that her pension would have "come very close to doubling," simply added $60,000 to Overman's existing yearly pension sum of $61,909. This made Overman's present yearly pension benefits nearly $20,000 more than the $102,276 yearly salary that the district court concluded she would have earned as Baton Rouge police chief. It is difficult to understand how, in retirement, Overman would have earned more than her active salary as police chief would have been. On remand, the district court should make an effort to explain more fully its rationale in the treatment of these pension benefits, and consider taking additional evidence regarding how pension benefits are calculated.

## IV.

In sum, the district court did not clearly err in finding that Overman established that the defendants' proffered reasons for not hiring her were

13

No. 15-30948

pretextual. We thus AFFIRM the district court's finding of liability under Title VII. We, however, VACATE the district court's award of damages, and REMAND this action for reconsideration of whether Overman undertook reasonable efforts to mitigate her damages after leaving employment to enroll in school.

AFFIRMED in part; VACATED in part;

REMANDED.