**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KIMBERLY MILLER,
*Plaintiff-Appellee,*

v.

AT&T CORPORATION, a foreign
corporation,
*Defendant-Appellant.*

EQUAL EMPLOYMENT ADVISORY
COUNCIL; CHAMBER OF COMMERCE, of
the United States of America;
SECRETARY OF LABOR;
COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,
*Amici Curiae.*

No. 00-1277

KIMBERLY MILLER,
*Plaintiff-Appellee,*

v.

AT&T CORPORATION, a foreign
corporation,
*Defendant-Appellant.*

EQUAL EMPLOYMENT ADVISORY
COUNCIL; CHAMBER OF COMMERCE, of
the United States of America;
SECRETARY OF LABOR;
COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,
*Amici Curiae.*

No. 00-1928

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph Robert Goodwin, District Judge.
(CA-98-808-2)

Argued: January 24, 2001

Decided: May 7, 2001

Before WILKINS and MICHAEL, Circuit Judges, and
Claude M. HILTON, Chief United States District Judge
for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Wilkins wrote the majority
opinion, in which Judge Michael joined. Chief Judge Hilton wrote a
dissenting opinion.

---

## COUNSEL

**ARGUED:** Catherine Michele Kirk, AT&T CORPORATION, Mor-
ristown, New Jersey, for Appellant. Barbara Eby Racine, UNITED
STATES DEPARTMENT OF LABOR, Washington, D.C., for
Amicus Curiae Secretary. Lonnie Carl Simmons, LAW OFFICE OF
P. RODNEY JACKSON, Charleston, West Virginia, for Appellee.
**ON BRIEF:** Laura A. Kaster, AT&T CORPORATION, Basking
Ridge, New Jersey; William E. Robinson, Michael A. Kawash, ROB-
INSON & MCELWEE, Charleston, West Virginia, for Appellant.
Henry L. Solano, Solicitor of Labor, Steven J. Mandel, Associate
Solicitor, William J. Stone, Senior Trial Attorney, UNITED STATES
DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae
Secretary. Ann Elizabeth Reesman, Corrie L. Fischel, MCGUINESS,
NORRIS & WILLIAMS, L.L.P., Washington, D.C., for Amicus
Curiae Advisory Council; Stephen A. Bokat, Robin S. Conrad, Sussan
Mahallati Kysela, NATIONAL CHAMBER LITIGATION CENTER,
INC., Washington, D.C., for Amicus Curiae Chamber of Commerce.
Mary K. O'Melveny, Washington, D.C.; Ray A. Byrd, SHRADER,

BYRD & COMPANION, P.L.L.C., Wheeling, West Virginia, for Amicus Curiae Communications Workers.

---

## OPINION

WILKINS, Circuit Judge:

AT&T Corporation (AT&T) appeals orders of the district court finding it liable for violating Kimberly Miller's rights under the Family and Medical Leave Act (FMLA) of 1993, 29 U.S.C.A. §§ 2601-2654 (West 1999), and awarding back pay and attorneys' fees. With respect to liability, AT&T contends that it did not violate the FMLA because the illness for which Miller sought FMLA leave—an episode of the flu—was not a serious health condition as defined by the Act and implementing regulations; that if Miller's flu was a serious health condition under the applicable regulations, those regulations are contrary to congressional intent and are therefore invalid; and that in any event, Miller failed to comply with AT&T's procedures for the granting of FMLA leave. With respect to the award of back pay, AT&T claims that the award should have been limited by after-acquired evidence and Miller's failure to mitigate her damages.[1] We conclude that none of AT&T's challenges warrants reversal, and we therefore affirm.

### I.

#### A.  *The Family and Medical Leave Act*

The FMLA entitles an eligible employee to as many as 12 weeks of unpaid leave per year for "a serious health condition that makes the employee unable to perform the functions of the position of such employee."[2] 29 U.S.C.A. § 2612(a)(1)(D). The Act defines "serious health condition" as

---

[1]AT&T also requests, in the event we rule in its favor on any of the grounds raised, that we vacate the award of attorneys' fees and remand for reconsideration. Because we reject all of AT&T's challenges to the determination of liability and the award of back pay, there is no reason to disturb the award of attorneys' fees.

[2]An "eligible employee" is one who, with certain exceptions not relevant here, has been employed for at least 12 months and who has at least

an illness, injury, impairment, or physical or mental condition that involves—

> (A)   inpatient care in a hospital, hospice, or residential medical care facility; or

> (B)   continuing treatment by a health care provider.

*Id.* § 2611(11). Thus, as is relevant here, an eligible employee is entitled to FMLA leave for an illness that incapacitates the employee from working and for which the employee receives "continuing treatment," a term the FMLA does not define.

The FMLA grants the Secretary of Labor authority to promulgate regulations implementing the Act. *See id.* § 2654. Pursuant to this authority, the Secretary promulgated the following regulation:

> A serious health condition involving continuing treatment by a health care provider includes . . . :

> (i)   A period of *incapacity* (*i.e.*, inability to work . . .) of more than three consecutive calendar days . . . that also involves:

>> (A)   Treatment two or more times by a health care provider . . . ; or

>> (B)   Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2) (2000). The regulations further provide that "treatment" "includes (but is not limited to) examinations to deter-

---

1,250 hours of service during the previous 12 months. *See* 29 U.S.C.A. § 2611(2)(A). AT&T has never disputed that Miller was an "eligible employee" under the FMLA.

mine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114(b) (2000).

The FMLA allows an employer to require that a request for leave for an employee's serious health condition be supported by a certification from the employee's health care provider. *See* 29 U.S.C.A. § 2613(a). Among other things, the employer may require that the certification include "appropriate medical facts" regarding the condition. *Id.* § 2613(b)(3). If the employer doubts the validity of a certification, it may require the employee to obtain a second opinion at the employer's expense. *See id.* § 2613(c)(1). In the event of a conflict between the two opinions, the employer may require the employee to obtain a third opinion, again at the employer's expense. *See id.* § 2613(d)(1). The opinion of the third health care provider is binding on both parties. *See id.* § 2613(d)(2).

The FMLA provides a private cause of action to an employee whose request for FMLA leave has been improperly denied by an employer. *See id.* § 2617(a). A prevailing employee may be awarded damages, liquidated damages, and equitable relief such as reinstatement. *See id.* § 2617(a)(1). The court must also award attorneys' fees and costs to a prevailing plaintiff. *See id.* § 2617(a)(3).

### B.  *AT&T's Attendance and Leave Policies*[3]

#### 1.

AT&T considers satisfactory attendance to be a condition of employment, and it expects all employees to be at work on time on scheduled work days and to remain at their posts during scheduled hours. However, AT&T does not have specific standards for determining whether an employee's attendance is unsatisfactory. Rather, a determination of unsatisfactory attendance is made based upon the reasons for the employee's absences, the circumstances involved, the employee's record with AT&T, and the employee's length of service. Absences are either "chargeable" or "non-chargeable," and only

---

[3]The facts regarding AT&T's attendance and leave policies, and the facts regarding Miller's employment history, *see infra* Part I.C., are undisputed.

chargeable absences are considered in determining whether an employee's attendance is satisfactory. Absences covered by the FMLA are considered non-chargeable.

Employee attendance is monitored by an attendance administrator, who reviews the employee's record after each absence. If this review demonstrates that the employee's attendance is unsatisfactory, the attendance administrator may recommend disciplinary action to the employee's supervisor. In evaluating an employee's attendance, a supervisor may not consider an absence as to which there is a pending request for FMLA leave.

AT&T employs a progressive disciplinary system for attendance matters. The first step in this system is a "development session," during which the employee is reminded of the requirements of AT&T's attendance policy. If the employee's attendance does not improve, the employee is engaged in a "serious discussion" about his attendance. A serious discussion includes a warning that the employee's attendance problems must be corrected if formal disciplinary action is to be avoided. If the serious discussion proves ineffective, the employee is issued a "letter of warning" and subsequently, if necessary, a "final letter of warning." An employee may be terminated for a chargeable absence incurred while under a final letter of warning.

2.

AT&T has implemented procedures for employees who seek FMLA leave. In order to request FMLA leave, an employee must submit two forms. The first, a Family and Medical Leave of Absence Notification Form ("FMLA-1"), requires the employee to provide general information regarding the reason for the requested leave and the expected duration of the leave if known. The form is completed by a supervisor, who verifies that the employee is eligible for FMLA leave, *i.e.*, that the employee has worked the requisite number of hours during the preceding 12-month period and has not exhausted all FMLA leave. The second form, a Certification of Health Care Provider ("FMLA-2"), requires the employee's doctor to provide information regarding the employee's health condition. Item 3 on the

FMLA-2 requires the physician to indicate which of six categories of serious health conditions the employee's illness falls into.[4]

Once completed, both forms are submitted to AT&T's Health Affairs office in Morristown, New Jersey. The forms are first reviewed for completeness, then forwarded to a case manager. The case manager, a registered nurse, recommends granting or denying the request for leave based upon the submitted information. If the submission is not complete, or if clarification is required, further information may be requested from the employee or the employee's doctor. A final decision regarding the request for leave is made by an operations manager, who then communicates the decision to the employee and the employee's supervisor. If a request for FMLA leave is denied, the employee may resubmit the request. However, resubmitted requests are rarely granted.

### C.  *Miller's Employment*

#### 1.

Miller was employed by AT&T as an account representative from September 1990 until her termination in March 1997. In November 1994, Miller's supervisor, Steve Snedegar, engaged Miller in a serious discussion about her attendance record.[5] Snedegar warned Miller that continued absences could result in the issuance of a letter of warning, and he encouraged her to make use of FMLA leave. Snede-

---

[4]AT&T's FMLA-2 is quite similar to Form WH-380, promulgated by the Secretary of Labor as an example of an appropriate format for requesting medical certification of FMLA leave. *See* 29 C.F.R. Pt. 825, App. B (2000); *see also* 29 C.F.R. § 825.306(a) (2000) (noting that the Department of Labor "has developed an optional form (Form WH-380, as revised) for employees' . . . use in obtaining medical certification"). Form WH-380 includes an attachment identifying, in language that parallels the regulations, the categories of serious health conditions. Although the record does not contain the corresponding attachment for AT&T's FMLA-2, there appears to be no dispute that the categories are the same as those on the WH-380.

[5]The record does not reveal whether this serious discussion was preceded by a development session.

gar had a second serious discussion with Miller regarding her attendance on October 31, 1995. After Miller incurred additional chargeable absences on December 4, 1995 and January 3 and 4, 1996, AT&T issued a letter of warning. The letter informed Miller that her attendance was unsatisfactory and that she could be subject to further disciplinary action, including dismissal, if her attendance did not improve.

In spite of this warning, Miller incurred three more chargeable absences in March and April 1996. However, rather than proceeding to the next step in the disciplinary process and issuing Miller a final letter of warning, AT&T reissued the previous letter of warning. Miller incurred yet more chargeable absences on May 16 and June 17. As a result, AT&T issued Miller a final letter of warning on June 25, 1996. The letter specifically warned Miller that her next chargeable absence could result in dismissal.

On August 27, AT&T advised Miller that the final letter of warning would be rescinded if she had perfect attendance through December 27 and that the letter of warning would be rescinded if she had perfect attendance through March 27, 1997. Nevertheless, Miller incurred a chargeable absence on December 19. Miller was not discharged for this absence, but the final letter of warning remained in effect.

On December 26, 1996, Miller began feeling ill while at work. She completed her shift that day but was too ill to work on the 27th. The following day, Miller sought treatment at an urgent care center. Dr. T. Donald Sommerville diagnosed Miller as suffering from the flu and determined that she was severely dehydrated. He also conducted a blood test, which revealed that Miller's white blood cell and platelet counts were significantly lower than normal. After administering intravenous fluids, Dr. Sommerville directed Miller to take over-the-counter medications to alleviate her symptoms and to return on December 30 for reevaluation. On December 30, Dr. Sommerville examined Miller and conducted another blood test, which revealed that Miller's white blood cell and platelet counts were still low, although the platelet level had improved and Miller felt better. After consulting a hematologist, Dr. Sommerville directed Miller to return two weeks later for a third blood test. By the time of the third test, Miller's white blood cell and platelet counts had returned to normal.

At the conclusion of her initial visit on December 28, Miller was given a work-excuse slip for December 28 through the 31st. On December 31, Miller telephoned the urgent care center and requested a work-excuse slip for January 1, explaining that she was feeling better but needed an additional day off work. The urgent care center granted this request.

Miller subsequently requested FMLA leave for December 27 through January 1. In response to item 3 on the FMLA-2, Dr. Sommerville checked category II, indicating that Miller suffered a period of incapacity of at least three consecutive calendar days involving treatment two or more times.[6] The next item on the form, item 4, provided:

> *To Be Completed only for a "serious health condition" of an employee's spouse, child, or parent*: Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories.

J.A. 345.[7] Although Dr. Sommerville was not required to respond to item 4 because Miller herself was the patient, he nevertheless wrote "Influenza type 'A' (See Attached Statement)." *Id.* Attached to the FMLA-2 were copies of a bill indicating the treatment Miller received on December 28 and a sheet of instructions to Miller. The instruction

---

[6]Category II also applies to periods of incapacity accompanied by a single visit to a health care provider that results in a regimen of continuing treatment. Dr. Sommerville's instructions to Miller to rest, take over-the-counter medications, and increase her fluid intake did not constitute a regimen of continuing treatment. *See* 29 C.F.R. § 825.114(b) (explaining that "the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bedrest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave").

[7]As noted previously, *see supra* note 4, AT&T's FMLA-2 is based upon, and is very similar to, Form WH-380 promulgated by the Secretary of Labor. However, item 4 on Form WH-380 is not limited to serious health conditions suffered by an employee's spouse, child, or parent.

sheet included the notation, "Recheck in 2 days, sooner or to ER if worse." *Id.* at 348.

AT&T denied Miller's request for FMLA leave on February 26, 1997. Maxine M. Condie, RN, a division manager with the Health Affairs Office, determined that Miller's illness was not covered by the FMLA because (1) the flu is not generally considered to be the type of condition for which an employee is entitled to FMLA leave; and (2) the information submitted by Miller did not demonstrate that she received treatment on two or more occasions.

On March 12, Attendance Administrator Kathy Collison learned that Miller's FMLA request had been denied. Collison reviewed Miller's attendance record and concluded that Miller should be terminated for excessive absenteeism. In connection with this review, Collison consulted Joan O'Hara of the Health Affairs Office, who informed Collison that any attempt by Miller to reopen the denial of the leave request would be unsuccessful. Collison recommended termination to Miller's immediate supervisor, Nan Hensley. After reviewing Miller's attendance record and consulting with various others, including Snedegar, Hensley decided to fire Miller. Miller was terminated on March 20, 1997.

2.

At the time of Miller's termination, she had two additional absences, on January 21 and January 31. Miller was absent on January 21 so that she could take her husband to an appointment with an eye doctor. On January 27, Miller applied for intermittent FMLA leave to transport her husband to and from appointments related to his vision problems. *See* 29 U.S.C.A. § 2612(b)(1). In connection with its evaluation of the request, AT&T contacted Mr. Miller's physician, who provided a list of dates on which he had seen Mr. Miller. Because January 21 was not among the listed dates, the Health Affairs Office denied FMLA coverage for this absence. During discovery in this litigation, however, another physician submitted an affidavit stating that he had examined Mr. Miller on January 21 and had dilated Mr. Miller's eyes, making it impossible for him to drive home.

Miller was absent on January 31 due to side effects of an injection she received on January 30 to treat a chronic medical condition. On

February 3, Miller requested intermittent leave to receive three injections—including the one she had received on January 30—and for a follow up visit. Miller's request form also noted that she "may also miss work because of pain from" her condition. J.A. 729. The Health Affairs Office granted Miller four days of intermittent FMLA leave—one day for each injection plus one day for a follow-up appointment. The Health Affairs Office did not grant Miller FMLA leave for her absence on January 31.

AT&T's Health Affairs Office denied Miller's FMLA leave requests for the January 21 and 31 absence on or about May 29, 1997. Had Miller not already been terminated based upon the December 27-January 1 absence, AT&T would have terminated her employment for the absences on January 21 and 31.

3.

Following her termination, Miller unsuccessfully sought full-time employment with several companies. In August 1997, after seeking employment for five months, she enrolled as a full-time student at the West Virginia University Institute of Technology, where she trained for a position as an operating room technician. From July 1998 to January 1999, Miller worked six to 12 hours per week at a restaurant. On August 1, 1999, Miller began full-time employment as an operating room technician. In this position, Miller earns approximately $30 less per day than she did at AT&T.

D. *Procedural History*

Miller filed this action in August 1998, alleging, as is relevant here, that AT&T violated her rights under the FMLA by denying her request for FMLA leave for the December 27-January 1 absences. Following discovery, the district court granted summary judgment to Miller on the issue of liability, holding that Miller's flu constituted a serious health condition and that she had provided adequate certification of her need for FMLA leave. *See Miller v. AT&T*, 60 F. Supp. 2d 574, 579-80 (S.D. W. Va. 1999) [hereinafter *Miller I*]. The question of the appropriate remedy was submitted to the district court on stipulated facts. The court held that Miller was entitled to back pay,

plus interest, from the date of her termination to the date of the order.[8] *See Miller v. AT&T*, 83 F. Supp. 2d 700, 709 (S.D. W. Va. 2000) [hereinafter *Miller II*].

## II.

We first consider AT&T's challenge to the grant of summary judgment on the question of liability. AT&T attacks the ruling on three fronts. First, AT&T contends that the flu, or at least the flu from which Miller suffered, is not a "serious health condition" within the meaning of the Act and regulations. Alternatively, AT&T argues that to the extent that Miller's flu met the regulatory criteria for a serious health condition, those criteria are invalid as contrary to Congress' intent in enacting the FMLA. Finally, AT&T contends that it properly denied Miller's request for FMLA leave because the certification she submitted in support of the request was inadequate. We review the grant of summary judgment de novo, and we must affirm if the undisputed facts establish that Miller was entitled to judgment as a matter of law. *See Wadkins v. Arnold*, 214 F.3d 535, 538 (4th Cir.), *cert. denied*, 121 S. Ct. 485 (2000).

## A.

We turn first to AT&T's contention that Miller's flu was not a "serious health condition" under the Act and regulations. First, AT&T contends that Miller cannot satisfy the regulatory criteria for a serious health condition because she did not receive "treatment" on two or more occasions.[9] Failing this, AT&T argues that even if Miller qualified for FMLA leave under the regulatory criteria for "continuing treatment," the regulations specifically exclude the flu from FMLA coverage. We address these claims seriatim.

---

[8]The district court also ordered AT&T to offer Miller reinstatement, which she declined. The court denied Miller's requests for front pay and liquidated damages. These portions of the order of the district court are not before us.

[9]AT&T does not dispute that Miller was an eligible employee or that Miller was incapacitated for three or more consecutive days.

We begin with AT&T's contention that Miller did not receive treatment from Dr. Sommerville on two or more occasions. AT&T asserts that Miller's second visit to Dr. Sommerville—during which he conducted a physical examination and drew blood—did not constitute "treatment" because Dr. Sommerville simply evaluated Miller's condition. However, this assertion is contradicted by the regulations, which define "treatment" to include "examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114(b). Under this definition, Miller's second visit to Dr. Sommerville clearly constituted "treatment."

AT&T next argues that even if Miller satisfies the regulatory criteria for a "serious health condition," the regulations nevertheless specifically exclude the flu and other minor illnesses from coverage under the FMLA. AT&T points to the following regulatory language:

> Ordinarily, unless complications arise, the common cold, *the flu*, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, *etc.*, are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave.

29 C.F.R. § 825.114(c) (2000) (emphasis added). According to AT&T, this regulation establishes that absent complications, the flu is never a serious health condition even if the regulatory test is satisfied.[10] *See Brannon v. Oshkosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1036 n.8 (M.D. Tenn. 1995) ("Although the flu patient may pass the [regulatory] test, flu is specifically excluded from coverage" under the FMLA.). We disagree.

---

[10]AT&T also maintains that Miller did not suffer any "complications" from the flu. Miller argues that her severe dehydration and lowered white blood cell and platelet counts constituted complications within the meaning of the regulation. In light of our conclusion that § 825.114(c) does not preclude FMLA coverage of an episode of the flu when the regulatory definition of a serious health condition is satisfied, we need not decide whether Miller suffered from any complications.

There is unquestionably some tension between subsection (a), setting forth objective criteria for determining whether a serious health condition exists, and subsection (c), which states that certain enumerated conditions "ordinarily" are not serious health conditions. Indeed, that tension is evidenced by Miller's illness. Miller was incapacitated for more than three consecutive calendar days and received treatment two or more times; thus, she satisfied the regulatory definition of a serious health condition under subsection (a). But, the condition from which Miller suffered—the flu—is one of those listed as being "ordinarily" not subject to coverage under the FMLA. AT&T urges us to resolve this tension by holding that subsection (c) essentially excepts the enumerated ailments from FMLA coverage even when an individual suffering from one of those ailments satisfies the regulatory criteria of subsection (a).

Miller, in contrast, urges us to defer to the position taken by the Secretary of Labor in a 1996 opinion letter:

> The FMLA regulations . . . provide examples, in section 825.114(c), of conditions that ordinarily, unless complications arise, would not meet the regulatory definition of a serious health condition and would not, therefore, qualify for FMLA leave . . . . Ordinarily, these health conditions would not meet the [regulatory criteria] . . . . If, however, any of these conditions met the regulatory criteria for a serious health condition, . . . then the absence would be protected by the FMLA.
>
> . . . Complications, per se, need not be present to qualify as a serious health condition if the regulatory . . . tests are otherwise met. The regulations reflect the view that, ordinarily, conditions like the common cold and flu (etc.) would not be expected to meet the regulatory tests, not that such conditions could not routinely qualify under FMLA where the tests are, in fact, met in particular cases.

Opinion Letter FMLA-86, 1996 WL 1044783 (Dec. 12, 1996). The 1996 letter superseded a previous opinion letter ("the 1995 letter") that concluded that meeting the regulatory criteria "'does not convert minor illnesses such as the common cold into serious health condi-

tions in the ordinary case (absent complications).'" *Thorson v. Gemini, Inc.*, 205 F.3d 370, 378 (8th Cir.) (quoting Opinion Letter FMLA-57 (Apr. 7, 1995)), *cert. denied*, 121 S. Ct. 172 (2000). In the 1996 letter, the Department of Labor stated that "[u]pon further review of this issue . . . , we have determined that [the 1995] letter expresses an incorrect view, being inconsistent with the Department's established interpretation of qualifying 'serious health conditions' under the FMLA regulations." Opinion Letter FMLA-86.

Agency interpretations that are contained in opinion letters "are entitled to respect . . . , but only to the extent that those interpretations have the power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (internal quotation marks omitted); *cf. Flood v. New Hanover County*, 125 F.3d 249, 253 (4th Cir. 1997) (explaining that while letter ruling is not binding, "it does constitute a body of experienced and informed judgment, and we give it substantial weight" (internal quotation marks omitted)). However, "an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (internal quotation marks omitted). AT&T argues that the 1996 letter is not persuasive in light of its inconsistency with the 1995 letter.

Even without deferring to the 1996 letter, we nevertheless conclude that § 825.114(c) is properly interpreted as indicating merely that common ailments such as the flu normally will not qualify for FMLA leave because they generally will not satisfy the regulatory criteria for a serious health condition. *See Thorson*, 205 F.3d at 379 (adopting this interpretation of the regulations without deferring to 1996 letter). Whenever possible, this court must reconcile apparently conflicting provisions. *See Chem. Weapons Working Group, Inc. v. United States Dep't of the Army*, 111 F.3d 1485, 1490 (10th Cir. 1997). That is not difficult to do here. 29 C.F.R. § 825.114(c) provides that "ordinarily" the flu will not qualify as a serious health condition. Presumably, this is because the flu (and the other conditions listed in the regulation) ordinarily will not meet the objective criteria for a serious health condition, inasmuch as such an illness normally does not result in an inability to work for three or more consecutive calendar days or does not require continuing treatment by a health care provider. Sec-

tion 825.114(c) simply does not automatically exclude the flu from coverage under the FMLA. Rather, the provision is best read as clarifying that some common illnesses will not ordinarily meet the regulatory criteria and thus will not be covered under the FMLA.[11]

B.

AT&T's next challenge to liability concerns the validity of the regulations themselves. The company argues that if Miller's flu was a serious health condition pursuant to the regulations, those regulations are invalid as contrary to congressional intent. AT&T primarily attacks the regulatory definition of "treatment," maintaining that a mere evaluation of a patient's condition should not qualify as treatment. However, AT&T also makes a more general challenge to the regulations, maintaining that Congress did not intend for the FMLA to cover relatively minor illnesses such as the flu.

In enacting the FMLA, Congress explicitly granted the Secretary of Labor authority to promulgate regulations implementing the Act. *See* 29 U.S.C.A. § 2654. Regulations promulgated pursuant to such an express delegation of authority "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Particularly when a regulatory choice "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845 (internal quotation marks omitted). Moreover, so long as the regulations promulgated by the Secretary are reasonable, we are not at liberty to question their wisdom. *See Nat'l Rifle Ass'n of Am. v. Reno*, 216 F.3d 122, 132 (D.C. Cir. 2000), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Feb. 22, 2001) (No. 00-1332). We must bear in mind, however, that "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the stat-

---

[11]This is the position taken by the Secretary of Labor, who filed an amicus brief and participated in oral argument.

ute." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976) (internal quotation marks omitted). Deference to administrative policymaking is not so great as to reduce our role to rubber-stamping regulations that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291 (1965). If the Secretary's regulations implementing the FMLA subvert congressional intent to a degree that renders the regulations arbitrary, we are obliged to declare them inconsistent with the statute. *See Chevron U.S.A.*, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

Congress enacted the FMLA in response to concern regarding, *inter alia*, "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C.A. § 2601(a)(4); *see* S. Rep. No. 103-3, at 11-12, *reprinted in* 1993 U.S.C.C.A.N. 3, 13-14 (noting that "[j]ob loss because of illness has a particularly devastating effect on workers who support themselves and on families where two incomes are necessary to make ends meet or where a single parent heads the household"). Congress did not intend to create a federal sick leave program but rather aspired to create a workable "minimum labor standard for leave" that would balance the needs of employees and the interests of employers. S. Rep. No. 103-3, at 4, *reprinted in* 1993 U.S.C.C.A.N. at 6; *see id.* at 4-5, reprinted in 1993 U.S.C.C.A.N. at 6-7; *see also Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999) ("The purpose of the FMLA is to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons."), *cert. denied*, 120 S. Ct. 1978 (2000).

We first consider AT&T's contention that the regulatory definition of "treatment" is overly broad because it includes mere evaluations of an employee's condition. Nothing in the legislative history discusses the "continuing treatment" requirement, and Congress elected not to provide a statutory definition of that term.[12] There is thus nothing

---

[12]The dissent contends that "the word 'treatment' is clear and unambiguous in and of itself," *infra* at 28, and does not include mere evalua-

upon which to base a conclusion that the regulatory definition of treatment, which allows for situations in which a health care provider determines that an illness requires continued monitoring but not aggressive treatment, is contrary to congressional intent. *Cf.* S. Rep. No. 103-3, at 29, *reprinted in* 1993 U.S.C.C.A.N. at 31 (noting that serious health conditions typically "involve either inpatient care or continuing treatment *or supervision* by a health care provider, and frequently involve both" (emphasis added)).

We note also that AT&T's challenge to the regulatory definition of "treatment" overlooks the fact that the "treatment" requirement does not stand alone. Consistent with the statutory language, the regulations require that treatment be accompanied by a period of incapacity of at least three consecutive days. It is apparent that the requirement that the employee be incapacitated will suffice to weed out those claims that are based on nothing more than multiple visits to a physician for a minor health complaint.

We next consider AT&T's more general argument that, to the extent the regulations permit FMLA coverage for the flu and similar illnesses, those regulations contravene the legislative purpose underlying the FMLA. In support of this claim, AT&T points to the following passage from the Senate Report:

> The term "serious health condition" is not intended to cover short-term conditions for which treatment and recovery are very brief. *It is expected that such conditions will fall within even the most modest sick leave policies.* Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period. Complications arising out of such procedures that

---

tions of a condition. We fail to see, however, how the cited definition of "treatment"—"the systemic effort to cure illness and relieve symptoms, as with medicines, surgery, etc.," *id.* (internal quotation marks omitted) —necessarily excludes determination of the appropriate course of treatment (*i.e.*, diagnosis) or periodic evaluations of a patient's condition to determine whether the chosen course of treatment is proving effective.

develop into "serious health conditions" will be covered by the act. . . .

   Examples of serious health conditions include but are not limited to heart attacks, heart conditions requiring heart bypass of [sic] valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth. All of these conditions meet the general test that either the underlying health condition or the treatment for it requires that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery. They also involve either inpatient care or continuing treatment or supervision by a health care provider, and frequently involve both.

S. Rep. No. 103-3, at 28-29, *reprinted in* 1993 U.S.C.C.A.N. at 30-31 (emphasis added); *see Bauer v. Dayton-Walther Corp.*, 910 F. Supp. 306, 310 (E.D. Ky. 1996) ("Congress sought to parse out illnesses which it believed should be treated under sick leave policy from those much more serious illnesses that implicate the protections of the FMLA."), *aff'd*, 118 F.3d 1109 (6th Cir. 1997).

   AT&T is correct, of course, that the legislative history indicates that in enacting the FMLA Congress was focused on "major" illnesses, such as cancer, rather than relatively minor ailments. But, the passage in the Senate Report on which AT&T relies is not reflected in the statutory language. *See Thorson*, 205 F.3d at 380. Rather, the FMLA defines "serious health condition" broadly "and does not include any examples of conditions that either do or do not qualify as FMLA 'serious health conditions.'" *Id.* Consistent with the statutory language, the regulations promulgated by the Secretary of Labor establish a definition of "serious health condition" that focuses on the effect of an illness on the employee and the extent of necessary treatment rather than on the particular diagnosis. This policy decision is

neither unreasonable nor manifestly inconsistent with Congress' intent to cover illnesses that "require[ ] that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery" and involve "continuing treatment or supervision by a health care provider." S. Rep. No. 103-3, at 29, *reprinted in* 1993 U.S.C.C.A.N. at 31. It is possible, of course, that the definition adopted by the Secretary will, in some cases—and perhaps even in this one—provide FMLA coverage to illnesses that Congress never envisioned would be protected. We cannot say, however, that the regulations adopted by the Secretary are so manifestly contrary to congressional intent as to be considered arbitrary. *See Thorson*, 205 F.3d at 380.

## C.

Finally, AT&T contends that the documentation submitted by Miller in support of her request for FMLA leave was inadequate because it did not indicate that she had received treatment two or more times. As noted above, Dr. Sommerville checked Category II on the FMLA-2, indicating that Miller had suffered a period of incapacity of three or more days and had received treatment two or more times. Additionally, Miller submitted a copy of an instruction sheet indicating that she was to return to the urgent care center in two days for a follow up visit. As we understand AT&T's argument, it contends that Miller's submission would have been adequate if either (1) Dr. Sommerville had specifically stated, in response to item 4 on the FMLA-2, that he treated Miller two or more times; or (2) Miller had submitted some record of her second visit to Dr. Sommerville.

Both of these assertions attempt to take Miller to task for failing to provide information that AT&T did not request, and accordingly we reject them. First, by its terms the FMLA-2 only required Dr. Sommerville to check the appropriate category under item 3, which he undisputably did. AT&T nevertheless maintains that because Dr. Sommerville did not specify, in response to item 4, that he had treated Miller two or more times, the certification was inadequate on its face. However, Dr. Sommerville was not required to provide an answer to item 4 because that item specified that it was to be completed "only for a 'serious health condition' of an employee's spouse, child, or parent." J.A. 345 (emphasis omitted). Any failure by Dr.

Sommerville to provide information under item 4 is not an appropriate basis for the denial of Miller's request for FMLA leave. Similarly, nothing on the FMLA-2 required Miller to submit supporting documentation for her leave request. Under these circumstances, to deny a leave request on the basis that supporting documentation was not submitted would be unconscionable. Moreover, to the extent it viewed Miller's certification as incomplete, AT&T was required to provide Miller a reasonable opportunity to cure any deficiency. *See* 29 C.F.R. § 825.305(d) (2000).[13]

AT&T argues that a conclusion that the certification submitted by Miller was adequate would "render[ ] the certification process meaningless." Brief of Appellant at 30. We disagree. The FMLA allows employers to require information regarding the "medical facts" supporting a health care provider's conclusion that the employee suffered from a serious health condition. The salient point, however, is that AT&T elected not to require such information on its certification form.

## III.

Having determined that the district court correctly found AT&T liable for violating Miller's rights under the FMLA, we turn to AT&T's challenges to the back pay award. The company first maintains that, pursuant to the after-acquired evidence doctrine, the award should be limited to the period from Miller's termination on March 20, 1997 to May 29, 1997, when the Health Affairs Office denied Miller's requests for FMLA leave for the January 21 and 31 absences. Second, AT&T argues that Miller failed to mitigate her damages. Although our reasoning differs from that of the district court with respect to the after-acquired evidence claim, we nevertheless con-

---

[13]The district court criticized AT&T for failing to follow the "second opinion" procedures in the FMLA. *See Miller I*, 60 F. Supp. 2d at 580. We agree with AT&T that a second opinion would have been of no use here. AT&T never questioned Miller's assertion that she had the flu or that she was unable to work for the duration of her illness. Rather, AT&T questioned whether Miller had received treatment on two or more occasions and whether the flu was a FMLA-covered illness. A second medical opinion would not have shed light on either of these questions.

clude that Miller was entitled to the full amount of back pay awarded by the district court.

The question of the appropriate remedy was submitted to the district court on facts to which the parties jointly stipulated. We are thus presented only with questions of law, which are subject to de novo review. *See Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 138 (4th Cir. 2000).

A.

AT&T maintains that the denial of FMLA leave for the January absences constitutes after-acquired evidence under *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362-63 (1995) (holding that an award of back pay may be limited by subsequently acquired evidence of employee wrongdoing that would have justified the employee's termination). The district court rejected this argument, concluding that the after-acquired evidence doctrine was not available to AT&T and, alternatively, that the doctrine should not limit Miller's back pay award because she was entitled to FMLA leave for the January absences. *See Miller II*, 83 F. Supp. 2d at 705-06. We agree with AT&T that the after-acquired evidence doctrine applies to AT&T's claim that it would have terminated Miller for the January absences. Nevertheless, we affirm the district court because AT&T failed to meet its burden of establishing that Miller was not entitled to FMLA leave for those absences.

The after-acquired evidence doctrine concerns the effect of evidence of employee misconduct acquired by the employer after the employee has been terminated for a discriminatory reason. In *McKennon*, the Supreme Court held that evidence of employee wrongdoing acquired after wrongful termination may limit an award of back pay (and disentitle an employee to front pay and reinstatement) when the employer establishes "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362-63. The doctrine thus balances the need to enforce national employment policy by deterring and punishing employer misconduct, while taking "due account of the lawful prerogatives of the employer

in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." *Id.* at 361.

The district court concluded that the after-acquired evidence doctrine did not apply to the January absences because "AT&T was aware of Miller's additional absences at the time of her termination" and "therefore had the ability to evaluate that conduct as part of an overall decision to terminate her employment." *Miller II*, 83 F. Supp. 2d at 705. This reasoning overlooks the fact that, while AT&T was aware that the additional absences had occurred when it terminated Miller, the Health Affairs Office had not yet determined whether those absences were covered by the FMLA. AT&T policy therefore prohibited it from considering those absences in deciding whether to terminate Miller. *Cf.* 29 C.F.R. § 825.307(a)(2) (2000) (providing that an employee is "provisionally entitled" to protection under the FMLA while the employer seeks a second opinion).

Perhaps recognizing this flaw in its logic, the district court noted that AT&T should have resolved the ongoing investigation into the additional absences before deciding to terminate Miller. *See Miller II*, 83 F. Supp. 2d at 705. Such a requirement is not realistic. Indeed, in the case of a chronically absent employee, it is entirely possible that evaluating all outstanding requests for FMLA leave before making a decision would effectively preclude any action by the employer.

Having determined that the after-acquired evidence doctrine applies to the January absences, we now turn to the question of whether AT&T could have terminated Miller for those absences, *i.e.*, whether the absences were protected by the FMLA. The district court concluded that Miller was entitled to FMLA leave for each absence, and thus declined to limit Miller's back pay award. *See id.* at 705-06. AT&T argues that this conclusion is precluded by the parties' stipulation that AT&T would have terminated Miller for the January 21 and 31 absences had it not already terminated her. The stipulation on which AT&T relies provides as follows:

> Because Miller's absences on January 21 and 31, 1997, were determined by AT&T not to be covered by the FMLA and were deemed chargeable, those absences were a violation of Miller's final letter of warning. Since Miller would

have remained under that final letter of warning, either or both of those absences would have resulted in Miller's termination if she had continued to be employed by AT&T at the time it was learned that they were in fact chargeable.

J.A. 706.

AT&T reads too much into this stipulation. In order to limit the award of back pay based upon the January absences, AT&T was required to prove (1) that Miller was not entitled to FMLA leave for the absences, and (2) that AT&T would in fact have terminated Miller based on the absences. *See McKennon*, 513 U.S. at 362-63. Unquestionably, the stipulation establishes that AT&T would in fact have terminated Miller for the January absences, thus satisfying the second part of AT&T's burden. However, the stipulation does not establish that Miller was not entitled to FMLA leave for the January absences, but rather only states that *AT&T believed* that the absences were not covered by the FMLA. The stipulation thus does not meet AT&T's burden under the first prong of the after-acquired evidence doctrine. And, since AT&T raises no other challenge to the conclusion of the district court that Miller was entitled to FMLA leave for the January absences, we affirm that ruling.

B.

AT&T also argues that the award of back pay should have been limited by Miller's failure to mitigate her damages. A plaintiff in an employment discrimination case must mitigate damages by diligently "seeking and accepting new employment substantially equivalent to that from which he was discharged." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). Failure to diligently seek new employment precludes an award of back pay for the period during which employment was not sought. *See id.* The duty to mitigate is not without limits, however. For example, a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). The defendant bears the burden of demonstrating that the plaintiff has failed to fulfill the duty to mitigate. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995).

AT&T argues that Miller's decision to forego her search for employment and become a full-time student is inconsistent with the duty to diligently seek new employment. The district court disagreed, reasoning that a plaintiff who enrolls in school only after a diligent but unsuccessful search for employment has not failed to mitigate damages. *See Miller II*, 83 F. Supp. 2d at 707-08.

We conclude that Miller did not fail to mitigate her damages. "[T]he central question a court must consider when deciding whether a student-claimant has mitigated her damages is whether an individual's furtherance of [her] education is inconsistent with [her] responsibility to use reasonable diligence in finding other suitable employment." *Dailey v. Societe Generale*, 108 F.3d 451, 456-57 (2d Cir. 1997) (internal quotation marks omitted). Although AT&T cites cases in which equitable relief was denied or limited on the basis that the plaintiff had enrolled in school full-time, in each of these cases the plaintiff sought to obtain greater future benefits by doing so. *See, e.g.*, *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 112-13 (5th Cir. 1988) (affirming denial of front pay to plaintiff who had left nursing to enroll in law school); *Miller v. Marsh*, 766 F.2d 490, 492-93 (11th Cir. 1985) (affirming denial of back pay to plaintiff who abandoned temporary stenographer job in order to enroll in law school); *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 267-68 (10th Cir. 1975) (affirming limitation of back pay award to plaintiff who enrolled in school full-time). The denial of back pay is arguably appropriate in such cases. *See Taylor*, 524 F.2d at 268 ("[W]hen an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school . . . would be like receiving a double benefit.").

Here, in contrast, Miller enrolled in school only after a diligent but fruitless search for employment. Moreover, the position for which Miller trained while in school was not a "step up"—as an operating room technician, Miller earns substantially less than she did at AT&T. Miller thus did not "voluntarily absent[ ] herself from an active job market because she believe[d] her ultimate earning potential [would] be enhanced with the benefit of further education." *Dailey*, 108 F.3d at 457; *see id.* at 456-58 (rejecting argument that plaintiff, who enrolled in school after six-month job search was unsuccessful, had failed to mitigate damages); *Smith v. Am. Serv. Co. of Atlanta, Inc.*,

796 F.2d 1430, 1432 (11th Cir. 1986) (holding that plaintiff who enrolled in school after unsuccessfully seeking employment for seven months, and who worked part-time while in school, did not fail to mitigate damages); *cf. Hanna v. Am. Motors Corp.*, 724 F.2d 1300, 1308-09 (7th Cir. 1984) (holding that plaintiff who had enrolled in school, but who applied for and was willing to accept full-time employment, had not failed to mitigate damages). We therefore affirm the district court on this issue.

IV.

In sum, we conclude that AT&T violated Miller's rights under the FMLA when it denied her request for leave for the December 27-January 1 absence. Miller's flu satisfied the regulatory criteria for a serious health condition, and, while we may question the wisdom of regulations that arguably extend the scope of FMLA coverage beyond what Congress envisioned, we cannot say that the regulations are arbitrary. Additionally, we decline to hold that Miller's certification that she suffered from a serious health condition was inadequate because it failed to include information that AT&T did not request. Finally, we affirm the award of back pay, concluding that the award should not be limited by the after-acquired evidence doctrine or by any failure of Miller to mitigate her damages.

*AFFIRMED*

HILTON, Chief District Judge, dissenting:

I believe the Secretary of Labor exceeded the scope of her delegated authority in promulgating regulations under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, that expanded the expressed limits of the statute. In so doing, the Secretary contradicted the express will of the Congress. Because I find that the Secretary's regulation that defines "continuing treatment" violates *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and is unconstitutional, I would reverse and order that judgment be entered for AT&T. I respectfully dissent.

The Constitution delegates to Congress alone "[a]ll legislative [p]owers." U.S. Const. art. I, § 1. Congress alone makes the law

which the Executive enforces under Article II of the Constitution. Congress cannot delegate its legislative power. *See Whitman v. American Trucking Associations*, 121 S. Ct. 903, 912 (2001); *Loving v. United States*, 517 U.S. 748, 771 (1996); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Out of these bedrock separation of powers principles, the Supreme Court has carved a limited exception for an administrative agency to elucidate or explain a provision of a statute that it executes provided Congress gives the agency such authority and gives it intelligible principles to guide its rulemaking. *See Whitman*, 121 S. Ct. at 912; *Chevron*, 467 U.S. at 842. A delegation of rulemaking authority is arguably the exercise of legislative power, the difference between legislative power and permissible administrative regulation being a very fine line. *See, e.g.*, *Whitman*, 121 S. Ct. at 920 (Thomas, J., concurring); *Whitman*, 121 S. Ct. at 920 (Stevens, J., concurring).

When an agency engages in rulemaking, it must do so carefully because of the delicate constitutional authority upon which such rulemaking rests and because of the scrutiny that courts will bring to bear on such exercises of raw, sweeping power by unelected and unaccountable officials. *See Chevron*, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction."). Accordingly, the Supreme Court has fashioned a two part test for a court to apply when it reviews an agency's construction of a statute which the agency administers. *See id.* at 842-43. First, if Congress' intent is express and unambiguous, it must be given effect both by the courts as well as the agency in question. *See id.* However, if Congress has not directly addressed the precise question at issue, the issue for the court is whether the agency's regulation is a permissible construction of the statute. *See id.* at 843. In determining whether an agency's interpretation of a statute is a permissible one, the Court must give the agency's interpretation controlling weight "unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Because legislative power is vested in Congress alone, *see* U.S. Const. art. I, § 1; *Whitman*, 121 S. Ct. at 920 (Thomas, J., concurring), we must look first and foremost to its express will in the plain terms of the statute itself. The Act defines a "serious health condition" as:

an illness, injury, impairment, or physical or mental condition that involves—

   (A)   inpatient care in a hospital, hospice, or residential medical care facility; or

   (B)   continuing treatment by a health care provider.

29 U.S.C. § 2611(11). At issue here is the definition of "continuing treatment." The Secretary promulgated a regulation that defined "continuing treatment" as including diagnosis and monitoring of a condition. *See* 29 C.F.R. § 825.114(b). She also promulgated a regulation defining "continuing treatment" in such a way so as to include some minor illnesses.[1] *See* Maj. Op. at 19-20.

The majority states that the legislative history provides no guidance about what does or does not constitute "continuing treatment." *See* Maj. Op. at 17. The majority also states that the statute does not define "continuing treatment" any further and thus there is an absence of expressed Congressional intent. *See id.* What the majority overlooks, however, is the most persuasive expression of legislative intent that exists: the plain meaning of the words of the statute itself. There is no need—in fact, it is not permissible—to defer to an agency interpretation of a statute when Congress has been express in the plain terms of the statute itself. *See Chevron*, 467 U.S. at 842-43.

The majority implicitly finds "continuing treatment" to be ambiguous or else it would not have deferred to the agency's interpretation. I do not find "continuing treatment" to be ambiguous at all. I find persuasive AT&T's argument that the word "treatment" is clear and unambiguous in and of itself. In the medical context, it means "the systematic effort to cure illness and relieve symptoms, as with medicines, surgery, etc.," *Random House College Dictionary* 1400 (rev. ed. 1980), or "management in the *application of remedies*; medical or surgical *application* or service," 18 *Oxford English Dictionary* 464

---

[1]These rules were promulgated by authority of 29 U.S.C. § 2654: "The Secretary of Labor shall prescribe such regulations as are necessary to carry out subchapter I of this chapter and this subchapter not later than 120 days after February 5, 1993."

(2d ed. 1989) (emphasis added). It is different from "diagnosis" which means "the process of determining by examination the nature and circumstances of a diseased condition," *Random House College Dictionary* 366 (rev. ed. 1980), or "determination of the nature of a diseased condition; identification of a disease by careful investigation of its symptoms and history," 4 *Oxford English Dictionary* 596 (2d ed. 1989). It is also different from mere monitoring or supervision of a condition. *See* 9 *Oxford English Dictionary* 1002 (2d ed. 1989) (monitoring means "to observe, supervise, or keep under review; to measure or test at intervals"); 17 *Oxford English Dictionary* 245 (2d ed. 1989) (supervision means "general management, direction, or control; oversight, superintendence"). It is elementary that in medicine, first, a physician diagnoses a condition and then, second, he treats that condition. The definition of one is not subsumed within the other. The fact is that they are different terms with different, plain meanings.

The majority recognizes that "treatment" does not mean "diagnosis" or "monitoring" and vice versa when it states,

> There is thus nothing upon which to base a conclusion that the regulatory definition of treatment, which allows for situations in which a health care provider determines that an illness requires *continued monitoring but not aggressive treatment*, is contrary to congressional intent.

Maj. Op. at 17-18 (emphasis added). I believe the majority is incorrect: The statute *is* clear that treatment is required, not mere monitoring. The majority recognizes that there is a difference between the medical acts of diagnosis/monitoring and treatment, but chooses to disregard the expressed will of the Congress that one be covered by FMLA but not the other. We presume that Congress means what it says when it writes laws. Had Congress intended to provide FMLA leave for diagnosis and monitoring in addition to treatment, it would have said so.[2] Instead, it provided only for treatment. In 29 C.F.R.

---

[2]In fact, a prior version of the bill, in defining "serious health condition," did provide for continuing treatment *or* continuous supervision. It was later narrowed to provide only for continuing treatment. *See* 137 Cong. Rec. H9777 (daily ed. Nov. 13, 1991) (statement of Rep. Goodling) (discussing Gordon-Hyde Amendment).

§ 825.114(b), the Secretary expanded the definition of "continuing treatment" to include diagnosis, supervision, or monitoring, in contravention of the clear language of Congress. 29 C.F.R. § 825.114(b) is therefore unconstitutional.[3]

When 29 C.F.R. § 825.114, which defines "serious health condition," is viewed more broadly, it becomes even more apparent that the Secretary's rulemaking exceeded the limits of the statute. Under paragraph (a), "serious health condition" is defined as either "inpatient care," 29 C.F.R. § 825.114(a)(1), or "continuing treatment," 29 C.F.R. § 825.114(a)(2). The regulation defining "continuing treatment" in turn provides two bases for coverage: treatment two or more times by a health care provider, 29 C.F.R. § 825.114(a)(2)(i)(A), or treatment by a health care provider on at least one occasion which results in a "regimen of continuing treatment" under the supervision of a health care provider, 29 C.F.R. § 825.114(a)(2)(i)(B).[4] While Miller sought coverage under the former, the latter prong demonstrates the internal inconsistency and arbitrariness of the Secretary's regulations. The second prong is a circular definition. It defines "continuing treatment" as requiring one visit to the doctor that is followed by . . . "continuing treatment"! This strikes me as representative of the futile attempt by the agency to define what is already a clear definition itself. "Serious health condition" is defined, in part, as a condition requiring "continuing treatment." It is downright bizarre to then define "continuing treatment" (in the second prong) as requiring "continuing treatment." This is indicative of the fact that "continuing treatment" means what it says: treatment (not diagnosis, supervision, monitoring, etc.) on a continuing basis. Both paragraphs (a) and (b), when read together, therefore evince a consistent scheme by the Secretary to expand the scope of FMLA coverage beyond what was intended by Congress.

There is an additional basis upon which I would find the Secretary's regulations to be an unconstitutional exercise of agency rulemaking. It is undisputed that Miller had the ordinary, garden variety

---

[3]This distinction is key in this case because Miller's second visit to Dr. Sommerville was, as the majority notes, *see* Maj. Op. at 13, for the purpose of examination only.

[4]Each, as the majority points out, requires proof of incapacity for three days.

flu. Congress never intended the ordinary flu to be covered by FMLA leave, as the majority acknowledges.[5] *See* Maj. Op. at 18-20. Until recently, the Department of Labor agreed that the flu was specifically excepted from the FMLA. *See* Maj. Op. at 14-15. The question under *Chevron* is of course not how we would interpret the statute *de novo* but, rather, whether the agency interpreted the statute in a permissible manner. Despite Congress' intent not to cover the ordinary flu, the majority acknowledges that the Secretary's "test" for "continuing treatment" might lead the ordinary flu to be covered, as is the result in this case. *See* Maj. Op. at 20. This, the majority claims, is not arbitrary. I disagree. Returning to first principles, the Secretary had the authority to promulgate regulations to *enforce* the FMLA only. What the Secretary did—and what the majority acknowledges she did—was to expand the scope of the statute beyond that which was intended by the Congress. The majority concedes this point explicitly:

> It is possible, of course, that the definition adopted by the Secretary will, in some cases—and perhaps even in this one —provide FMLA coverage to illnesses that Congress never envisioned would be protected.

Maj. Op. at 20. Expanding the coverage of the statute beyond what Congress intended is not only "arbitrary, capricious, [and] manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, but it is also a usurpation of legislative power, in violation of Article I of the Constitution. In short, it was arbitrary and capricious for the agency not to create a minor illness exception when it made the regulations in question and to expand the protection of the FMLA beyond what was intended by Congress.

Unelected, and therefore unaccountable, agency officials do not

---

[5]Since the majority has ably reviewed the extensive legislative history indicating Congress' intent in this regard, I will not repeat it here. I would only add that there were a number of floor statements in which Congressmen stated their understanding that the flu and other minor illnesses were not to be covered by the FMLA. *See, e.g.*, 137 Cong. Rec. H9727-28 (daily ed. Nov. 13, 1991) (statement of Rep. Roukema) ("sniffles or the flu" are not covered under the FMLA because they are not serious conditions).

have the constitutional right or power to make law. *See* U.S. Const. art. I, § 1; *Chevron*; *Whitman*. By contradicting the express will of Congress, what the Secretary did here was to make law, not enforce it. The Secretary's regulations as they relate to "continuing treatment" are unconstitutional usurpations of Congressional power and should be found unconstitutional under the *Chevron* doctrine either because they are contrary to the plain terms of the statute or because the Secretary's regulations are impermissible constructions of the statute. Accordingly, I would reverse the district court and direct it to enter judgment for AT&T. This would moot the issues of after-acquired evidence and mitigation. It follows that I would grant AT&T's motion for attorneys' fees.

For these reasons, I respectfully dissent.